# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:20-cr-0033 |
| ) | |
| JULIO OMAR SOTO ROBLES and GREGORY ) | |
| VEGA, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**APPEARANCES:**

**Delia Smith, United States Attorney**
**Kyle Payne, AUSA**
United States Attorney's Office
St. Thomas, U.S. Virgin Islands
    *For the United States of America,*

**Darren John-Baptiste, Esq.**
Law Offices of Darren John-Baptiste, PLLC
St. Thomas, U.S. Virgin Islands
    *For Defendant Julio Omar Soto Robles*,

**Matthew A. Campbell, Federal Public Defender**
**Kia Danielle Sears, AFPD**
Office of the Federal Public Defender
St. Thomas, U.S. Virgin Islands
    *For Defendant Gregory Vega.*

## MEMORANDUM OPINION

**MOLLOY, Chief Judge**

    **THIS MATTER** comes before the Court on Defendant Gregory Vega's ("Vega") Motion to Suppress Statement, filed on October 19, 2020. (ECF No. 24.) Vega moves to suppress the statements he made to Customs and Border Patrol ("CBP") agents and Homeland Security Investigations ("HSI") agents on August 20, 2020, "in violation of *Miranda* and the Fifth Amendment to the U.S. Constitution." *Id.* at 1. The Court held an evidentiary hearing on March

25, 2021, and April 6, 2021. For the reasons stated below, the Court will deny the motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The events leading to the arrests and prosecution of the Defendants took place on April 20, 2020. Officer Figueroa, an 11-year veteran with CBP, testified that on even date, he first encountered the Defendants while working at the customs booth in the section known as "primary inspection," at the Cyril E. King Airport (the "airport") on St. Thomas, U.S. Virgin Islands.

The Defendants were at the airport for a return flight to San Juan, Puerto Rico, having arrived just two days before. Because the Defendants' primary language was Spanish and Officer Figueroa is bilingual in English and Spanish, the Defendants were directed to his booth to make an initial binding statement in response to customary questions such as "[w]hat are you carrying, [and] what do you have with you[?]" (Hr'g Tr. 1 (Mar. 25, 2021), 22:12-14, ECF No. 56.) Officer Figueroa testified that the Defendants arrived at his booth together, with Vega carrying a small suitcase. Vega declared only two cartons of cigarettes. When Officer Figueroa entered the Defendants' names into the computer, the system returned an alert on Defendant Julio Omar Soto Robles ("Soto") for "smuggling." *Id.* at 21:21-26:3; 28:20-29:7. Because Soto and Vega were traveling together, Officer Figueroa took both Soto and Vega to the "secondary inspection" area of the airport for further questioning.

Officer Figueroa explained that, in "soft secondary," officers ask additional questions to verify any information they need to determine whether to release the passengers or continue with the inspection. If the passenger is not released after soft secondary, he proceeds to "hard secondary" where officers have the passenger provide a second binding declaration, after which the officer inspects the passenger's luggage.

Because Soto's name had triggered an alert indicating possible smuggling activity and Vega was traveling with Soto, CBP questioned each individually. Although Soto was questioned and released, Vega was taken to hard secondary for further inspection regarding his luggage. There, CBP Officer Perez questioned Vega, and Officer Figueroa provided the translation for the questions in the second binding declaration. The questions included whether there was anything in the luggage that could cut the officers when they inspected

the bag, what was in the luggage, whether he packed the suitcase himself, and whether he was carrying any tobacco, cigarettes, alcohol, or food. *Id.* at 23:15-18, 23-24. Vega answered the questions, again declaring only two cartons of cigarettes. Officer Figueroa testified that officers inquire about the quantity of cigarettes that passengers are carrying because "a lot of travelers are unaware of the maximum [number of cartons of cigarettes allowed], which is five cartons. Therefore, we do have a lot of travelers that exceed the amount allowable, so we have to take possession of the excess—of the cigarette cartons." *Id.* at 35:1-5.

Prior to the luggage inspection, when Officer Figueroa asked whether the luggage belonged to Vega, "he said it was his bag." *Id.* at 30:17-18. Following Vega's second binding declaration, Officer Figueroa proceeded to open the luggage in front of Vega and conduct the inspection. Once open, Officer Figueroa asked Vega if anything in the luggage belonged to him. Vega indicated everything in the luggage was his. While inspecting the luggage, the officers discovered brick-shaped packages concealed in the clothing, wrapped in a black covering. Upon finding the packages, Officer Figueroa again asked Vega if everything in the bag was his. At that point, "[Vega] said that it wasn't all his, that Mr. Soto had some stuff in there." *Id.* at 32:4-11. Thereafter, CBP officers performed a field test on the contents of the packages, which tested positive for cocaine.

Due to the positive field-test result, CBP officers alerted HSI that they had a passenger in their custody in the secondary inspection area of the airport. Officer Figueroa testified that he was with Vega continuously from the time the call was made to HSI until the HSI agents arrived. During that time, Vega was seated in hard secondary without handcuffs. Vega made no further statements, and no other questions were asked of him.

The Government's second witness, HSI Special Agent Blyden, a law enforcement officer for approximately 20 years, responded to the call in which the CBP officers said that they had discovered "what appeared to be cocaine in the luggage of two passengers." *Id.* at 38:4-6. The CBP officer identified the two passengers as Soto and Vega, with whose names Agent Blyden was already familiar, having received a call from CBP on August 18 regarding a referral to secondary of the same two individuals upon their arrival at the airport.

Agent Blyden testified that when she arrived at the airport on August 20, 2020, she introduced herself to the CBP supervisor and proceeded to hard secondary, where Vega was waiting. Before introducing herself to Vega, Agent Blyden spoke with the CBP officer to get more information about what was found and where it was located, and then took some pictures of the luggage and its contents. Agent Blyden then asked Vega if he spoke English and which language he preferred. He said he spoke a little English but that he was comfortable speaking in Spanish. As such, Officer Vazquez interpreted their full conversation thereafter.

Agent Blyden further testified that, at approximately 4:51 p.m., she and HSI Task Force Officer Stephanie Gabriel ("TFO Gabriel") introduced themselves to Vega, then showed Vega their credentials. Agent Blyden explained that they were there to ask some questions about what was happening. After introducing themselves, they proceeded to get a Spanish version of the *Miranda* form to read Vega his rights. Officer Vazquez read Vega the *Miranda* warnings from the form, after which Vega nodded his understanding and said, "yes," he was waiving his rights. *Id.* at 43:14-16. Agent Blyden testified that she then gave Vega the form to read in Spanish, for himself, but Vega replied that he did not know how to read. In response to Agent Blyden's question as to what grade he completed in school, Vega responded that he had completed the 7th or 8th grade. *Id.* at 43:1-4. Agent Blyden testified:

> [a]t that time, since he told me he only completed 7th or 8th grade, I took the form back [from] him and I explained to him again that, you did say that you're waiving your rights and we would like to talk to you. So after we did that, I went and told him in order for us to talk to him, he still had to sign the form. And that's when he signed the form.

*Id.* 43:21-44:2. Officer Blyden then watched as Vega signed. Agent Blyden wrote "1700 hours" at the top of the waiver form, leaving blank the spaces for date and time of signature at the bottom of the form.[1]

Agent Blyden testified that after Vega signed the waiver, she and TFO Gabriel questioned him about what he owned in the bag. Video footage of the interview and luggage

---

[1] The Government introduced the *Miranda* waiver form—bearing the signatures of Vega, Officer Blyden and TFO Gabriel—into evidence at the suppression hearing. (Ex. 2.)

inspection in hard secondary shows that Vega's movement was not restricted. He stood nearby and watched as the officers inspected the luggage and its contents.

After the inspection, Agent Blyden moved the interview to the CBP office, a more private space where there were fewer officers milling around. At approximately 5:07 p.m., Agent Blyden, TFO Gabriel, Officer Vazquez as interpreter, and Vega walked to the CBP office, where Agent Blyden began to record the interview approximately one to two minutes later. There, the interview continued for roughly thirty (30) minutes.[2]

At the start of the recording, Agent Blyden reminded Vega of his rights. Vega asked Agent Blyden a question and then continued to answer her questions. Once again, while in the CBP office, Vega was not handcuffed or otherwise physically restrained. Agent Blyden testified that the interview was "very cordial. He answered the questions. I saw that he understood." *Id.* at 55:17-18. Further, Vega was able to explain the events of the day to Agent Blyden. *See* (Hr'g Tr. 2 (Apr. 6, 2021), 11:7-15., ECF No. 57. Approximately twenty-three (23) minutes into the audio recording, Agent Blyden asked Vega who he thought had put the cocaine in his luggage. Shortly after, "[t]he interview ended after Mr. Vega stated that he didn't want to talk anymore." *Id.* at 55:12-14.

On September 18, 2020, the Government filed an Information against Soto and Vega charging them each with one count of Conspiracy to Possess with Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(B), and one count of Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). (ECF No. 16.) On April 1, 2021, a federal grand jury returned an Indictment charging the same. (ECF No. 48.)

## II. LEGAL STANDARD

Defendant Vega argues that his statements made to law enforcement officials were made in violation of his rights under the Fifth Amendment to the U.S. Constitution. The Fifth Amendment provides in relevant part that "[n]o person . . . shall be compelled in any criminal

---

[2] The Government introduced the audio recording of the interview in the CBP office into evidence at the suppression hearing. (Ex. 4.)

case to be a witness against himself." U.S. Const. amend. V. To safeguard an individual's Fifth Amendment privilege against self-incrimination, the Supreme Court created prophylactic rules in *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny that are designed to provide an added measure of protection against the inherently coercive nature of custodial interrogation. Pursuant to *Miranda*, the government may not introduce statements made by an individual who is subject to custodial interrogation unless he first was read the *Miranda* warnings or the circumstances of the interrogation fall under a limited set of recognized exceptions. *Miranda*, 384 U.S. at 445.

Once a suspect under custodial interrogation has been informed of his *Miranda* rights, he may waive his rights if his waiver is voluntary, knowing, and intelligent. *Colorado v. Spring*, 479 U.S. 564, 572 (1987); *Miranda*, 384 U.S. at 444. Although "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver," *North Carolina v. Butler*, 441 U.S. 369, 370 (1979), the government has the burden of proof that the following have been established:

> [f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ("The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word.").

Under the Fifth Amendment right against self-incrimination, a defendant's statements must also be voluntary to be admissible at trial. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000). A statement can be voluntary only when the speaker's "will was not overborne" and the statement "was the product of an essentially free and unconstrained choice by its maker, that it was the product of a rational intellect and a free will." *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (internal quotations omitted).

"[C]ourts look to the totality of circumstances to determine whether a confession was

voluntary." *Withrow v. Williams*, 507 U.S. 680, 693 (1993). "[T]he crucial element" of the inquiry, however, is "police coercion." *Id.* "Unless there is 'police conduct causally related to the confession,' a confession is considered voluntary. Thus, a court will not hold that a confession was involuntary unless it finds that it was the product of 'police overreaching.'" *Swint*, 15 F.3d at 289 (citations omitted) (quoting *Connelly,* 479 U.S. at 164).

### III. DISCUSSION

#### A. *Statements Made to CBP Officers During Border Inspection*

In his motion to suppress, Vega argues that "his freedom was deprived in a 'significant way,'" beginning when he was taken into secondary inspection by CBP. (ECF No. 24, ¶ 5.) Vega contends that CBP interrogated him without reading his *Miranda* rights. *Id.* ¶ 2. Vega further argues that he was "[u]nquestionably detained and subjected to a custodial interrogation" because he was "explicitly questioned . . . about his alleged crime and other matters relevant to his criminal prosecution, all questions intended to elicit an incriminating response." *Id.*, ¶¶ 5-6. Vega concludes that "'statements obtained during a custodial interrogation are inadmissible . . . if the defendant was not informed both of the right to counsel and the right to remain silent.'" *Id.*, ¶ 7 (quoting *United States v. Shabazz*, 564 F.3d 280, 286 (3d Cir. 2009).[3]

The Court of Appeals for the Third Circuit ("Third Circuit") has explained that "normal *Miranda* rules are, however, inapplicable to circumstances where border inspectors question persons seeking entry into the United States."[4] *United States v. St. Vallier*, 404 F. App'x 651, 656 (3d Cir. 2010) (citing *United States v. Long Tong Kiam*, 432 F.3d 524, 529-30 (3d Cir. 2006)) (describing the "responsibility of immigration or customs agents to inspect

---

[3] *United States v. Shabazz* is inapposite here. In *Shabazz*, the Third Circuit Court of Appeals reviewed the statement the defendant made after his arrest without having been Mirandized. The defendant in *Shabazz* was convicted of Hobbs Act Robbery in a circumstance unrelated to any entry at a border of the United States.

[4] It is well established that the United States created a border between the Virgin Islands and the rest of the United States for customs purposes shortly after acquiring the Virgin Islands from Denmark in 1917. For more than one hundred years, Congress has "authorized customs officials to search vessels and goods passing between the Virgin Islands and the rest of the country." *United States v. Hyde*, 37 F.3d 116, 121 (3d Cir. 1994). Consequently, customs officials at the Cyril E. King Airport in St. Thomas may conduct inspections and searches at their discretion.

entrants at our borders" and explaining that while persons questioned are undeniably in "custody" during inspection, "normal *Miranda* rules simply cannot apply to this unique situation at the border").

Moreover, a criminal offense, such as smuggling, "may be inextricably tied to a person's admissibility, yet customs officers are not required to provide *Miranda* warnings prior to asking questions that might bear upon this illegal conduct." *St. Vallier*, 404 F. App'x at 657 (citing *Kiam*, 432 F. 3d at 531). Similarly, questions that relate to both admissibility and potential criminal conduct (so long as they are not solely related to the prosecution of criminal activity) do not implicate *Miranda* in the border context, as established in *Kiam*. *See St. Vallier*, 404 F. App'x at 657. Furthermore, the same is true whether a person is in primary inspection or has been transferred to secondary for questioning and inspection—and regardless of whether the inquiry relates to the individual or to the individual's effects. *See id.* at 656-58. The Third Circuit has found "no distinction between questioning an alien to determine whether he is entitled to enter the country and questioning a U.S. Citizen to determine whether his effects are entitled to enter the country." *Id.* at 656, n.4 (citing *Kiam* 432 F.3d at 531).

Here, Vega was selected by CBP officers for inspection at the Cyril E. King Airport on St. Thomas (an international border) because the customs computer system alerted to the name of his traveling partner, Soto, for possible smuggling activity. After further questioning in soft secondary, Vega was taken to hard secondary where he was asked more questions, for a second binding declaration and inspection of his luggage.

In hard secondary, Officer Figueroa asked Vega about ownership of the contents of the luggage both before and after inspecting its contents. Prior to the officers finding the brick-shaped packages, Vega claimed the luggage contents as his own. After their discovery, Vega stated that some of the contents belonged to Soto. Vega argues that, after finding the packages inside the luggage, "[a]ny further questions were to . . . get more incriminating statements for trial." (ECF No. 57 at 68:4-6.) Vega contends that "there is no need to have questioning in between finding a brick and testing it." *Id.* at 70:3-6.

The Government responds that *St. Vallier* provides authority for Agent Blyden to ask

who the contents belonged to after the bricks were found in the suitcase—before the contents were field-tested. "[F]ederal regulations prohibit the importation of controlled substances. [19 C.F.R.§ 162.61.] But whether the defendant in that case, St. Vallier, was attempting to smuggle controlled substances into the country from Trinidad had a direct bearing on the admissibility of his effects." (ECF No. 57 at 74:22-75:2 (quoting *St. Vallier*, 404 F. App'x at 657 n.70).) At the suppression hearing, Vega replied that, in *St. Vallier*, "once the cocaine was discovered, the questioning ceased," *id.* at 76:3-4, which counsel for Vega contended supported Vega's argument.

The Court concludes that *Miranda* was not implicated by CBP questioning Vega in primary or secondary inspection up to the point at which the officers discovered the concealed bricks in the luggage, because *Miranda* warnings are not required in the context of admissibility questions at border crossings. The determinative question, then, is whether the officers crossed the line established by the Third Circuit in *Kiam* when they again asked Vega—after finding the bricks in the luggage but before field-testing their contents—if everything in the suitcase belonged to him, without first reading Vega his *Miranda* rights.

The Court agrees with the parties that *Kiam* and *St. Vallier* are instructive here. If Officer Figueroa's question after discovering the still-sealed bricks "objectively cease[d] to have a bearing on the grounds for admissibility and instead only further[ed] a potential criminal prosecution," the question crossed the line, and *Miranda* warnings were required. *Kiam*, 432 F.3d at 530. However, if there was simply an overlap and the question was relevant to the admissibility of Vega's luggage into the United States and also relevant to possible criminal conduct, the question did not cross the line, and no *Miranda* warnings were required. *St. Vallier*, 404 F. App'x at 657.

In *St. Vallier*, the interrogation ceased "once [the officer] learned that cocaine was discovered in [his] luggage." *Id.* at 658. The Third Circuit opined that the holding in *Kiam* suggested that "an admission of criminal conduct or discovery of drugs might represent a transition point after which questioning could only practically relate to a potential criminal prosecution." *Id.* at 658. The Court finds that the analysis in the instant case turns on the definition of "discovery of drugs"—whether finding "bricks" in the luggage, or packages

sealed in a manner that suggested they contained drugs, satisfies the definition, or whether it is only at the point at which the officers know that the packages contain drugs that the cocaine has been "discovered."

The Court finds a recent case of this Court to be on point. In *United States v. Bailey*, a CBP officer inspecting checked luggage selected a small duffle bag for inspection. No. 2020-0005, 2021 U.S. Dist. LEXIS 2930, at *3 (D.V.I. Jan. 7, 2021). Inside, the officer found sealed bricks concealed in a black towel, which—based on his years of experience—he suspected contained illegal contraband. An officer made a small incision in the package, releasing a "white powdery substance," and then contacted the airlines representative to speak with the passenger associated with the baggage tag. *Id.* Having already discovered the concealed package, and while suspicious that the passenger's bag contained contraband, the CBP officer questioned the passenger about his luggage, asking if the bag was his, if he packed the bag himself (to which he replied, "yes" to both), and whether he was carrying anything for anyone else (to which he replied, "no"). After the passenger answered the questions, the substance was field-tested and returned a positive result for cocaine. The CBP officer did not ask the passenger any questions after conducting the field test, but instead notified HSI, whose agents proceeded to interrogate the passenger upon arrival. There, the Court found *Miranda* warnings were not required prior to receiving the field test results, stating, "[t]his is precisely the established procedure that the Third Circuit discussed approvingly in *Kiam*." *Id.* at *19.

Here, the CBP officers adopted the same procedure, asking Vega about the contents of the luggage once the suspicious bricks were found but before they were field-tested. Significantly, as in *Bailey*, CBP last questioned Vega about the ownership of the bag's contents before CBP received the results of the field-test. Had the test resulted in a discovery of, say, flour—a substance that is legal to import into the United States—the suspicion of criminal activity would have been negated, and Vega would have been admissible to the United States. Instead, the moment Officer Figueroa learned that the field-test had returned a positive result for narcotics, contraband was effectively "discovered." Accordingly, the Court concludes that finding suspicious packages does not equate to a discovery of drugs.

Contraband is only "discovered" for purposes of customs at the point at which it is known to be an illegal substance. *Cf. St. Vallier*, 404 F. App'x at 652 ("[S]uspicion of criminal conduct does not overrule the simultaneous responsibility of immigration or customs agents to inspect entrants at the borders.").

Because the CBP inspection and questions bore on "both admissibility and criminal conduct," *id.* at 657, the Court finds that agents did not cross any line by not advising Vega of his *Miranda* rights before questioning him. *See also Kiam*, 432 F.3d at 531 ("At the point at which [the officer] ceased questioning about administrative admissibility and called in a criminal investigator, however, *Miranda* was implicated . . . ."). Once Officer Figueroa knew that the substance in the sealed bricks was cocaine, he appropriately ceased all questioning and referred Vega to HSI for investigation of criminal activity.

### B. Statements made to HSI Agent Blyden During Interrogation

Vega contends that the evidence is unclear as to whether he was read his *Miranda* rights before his interrogation with HSI Agent Blyden, (ECF No. 24, ¶ 7), in part because Officer Vazquez "inexplicably . . . 'advised' Mr. Vega of his 'rights' off camera," *id.*, ¶ 9. Additionally, Vega argues that there is no evidence that Officer Vazquez is a certified interpreter and asserts the Court must decide whether he "actually read the *Miranda* warnings as they are stated [to Vega] . . . because there is no evidence of that in terms of an audio [recording] or anything." (ECF No. 57 at 63:12-13.) Further, Vega argues that the waiver form, though in Spanish, is "incomplete." (ECF No. 24, ¶ 3.) Lastly, Vega contends there is no confirmation that he understood the rights he was abandoning prior to signing the waiver, and as such, any waiver was not made knowingly and intelligently. The Court takes each of these arguments in turn.

#### 1. Whether Officer Vazquez read Vega his *Miranda* Rights

As an initial matter, the Court disagrees with Vega that Officer Vazquez read him the *Miranda* warnings off camera. At the suppression hearing, the Government provided video evidence of the conversation and interaction in hard secondary between Agent Blyden, Officer Vazquez, and Defendant Vega, which showed Vega signing the waiver. Although there is no audio of the videotaped conversation in hard secondary, the video footage corroborates

*United States v. Soto Robles et al.*
Case No.: 3:20-cr-0033
Memorandum Opinion
Page **12** of **17**

the evidence provided by Agent Blyden's and Officer Vazquez' testimony about their introduction to Vega, Officer Vazquez' reading of the *Miranda* warnings to Vega, and the latter's signature and waiver.

Next, the Court looks to the presentation of the *Miranda* warnings. The Supreme Court has never required a verbatim recitation. *See California v. Prysock*, 453 U.S. 355, 359 (1981) ("This Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant."); *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (explaining that the prophylactic rules include "the now familiar *Miranda* warnings . . . or their equivalent"). Here, Vega asserts that Officer Vazquez did not translate directly from Spanish to English when he interpreted the interrogation that followed. He contends that, because Officer Vazquez paraphrased Vega's statements in the interrogation, there is no evidence to support a belief that Officer Vazquez read the *Miranda* warnings in Spanish "as they are stated." (ECF No. 57 at 63:22-24.)

The Court disagrees. Notwithstanding the fact that he may not be a certified interpreter, Officer Vazquez testified that he was a police officer in Puerto Rico for nineteen (19) years before becoming a CBP officer two (2) years ago. As such, Officer Vazquez has over two decades of experience giving *Miranda* warnings in Spanish, as well as in English. As such, this Court sees no reason to find that Officer Vazquez did not appropriately represent the *Miranda* warnings in his reading of the waiver form. *See Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) ("We have never insisted that *Miranda* warnings be given in the exact form described in that decision.") Indeed, unaware that Vega could not read Spanish, Agent Blyden extended a copy of the waiver form to Vega to read in Spanish after being Mirandized and before signing the waiver. There is no reason to believe Officer Vazquez would misrepresent the rights in translation, only to be found out by a literate suspect right after, upon being handed the card. To be sure, a suspect also "need not read a *Miranda* form to gain a full awareness of the rights being abandoned and the consequences of such a decision." *United States v. Vega-Arizmendi*, No. 2016-0009-13, 2017 U.S. Dist. LEXIS 4715, at *22-23 (D.V.I. Jan.

12, 2017). The Court finds credible Officer Vazquez' and Agent Blyden's testimony regarding the reading of *Miranda* warnings to Vega.[5]

Turning next to the allegedly incomplete waiver form, the Third Circuit has established that a written waiver's "main purpose is evidentiary, to establish with a minimum of difficulty and a maximum of certainty that the police gave the warnings and that the suspect had agreed—preliminarily—to answer questions." *Alston v. Redman*, 34 F.3d 1237, 1253 (3d Cir. 1994) (citing *Collins v. Brierly*, 492 F.2d 735, 739 (3d Cir. 1974)). Even without a written waiver, a suspect may give his implied waiver by his actions and words. *See Butler*, 441 U.S. at 373; *see also Vega-Arizmendi*, 2017 U.S. Dist. LEXIS 4715, at *22 ("[O]ne can knowingly and intelligently waive his *Miranda* rights without initialing—or even signing—a *Miranda* form.") (citing *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010)). Thus, just as "no talismanic incantation was required to satisfy [the] strictures" of the *Miranda* warnings, *Prysock*, 453 U.S. at 359, the effect of a suspect's waiver of rights is not nullified by a waiver being given orally. Likewise, the Court finds that the written waiver is not disturbed by blanks on the page, such as having the time it was signed written at the top of the form rather than on the line indicated therefor.

### 2. Whether the Waiver was Voluntarily, Knowingly, and Intelligently Given

An express written waiver "is usually strong proof of the validity of that waiver, but [it] is not inevitably either necessary or sufficient to establish waiver." *Butler*, 441 U.S. at 373. To assess the validity of a *Miranda* waiver, a district court must evaluate the totality of the circumstances to determine whether the waiver was voluntary, knowing, and intelligent. The Supreme Court established the relevant two-prong test in *Moran*:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation,

---

[5] The broader question of the accuracy of Officer Vazquez' translation of Vega's statements is a question of the weight, rather than the admissibility, of the evidence and is therefore a question for the jury, as factfinder. *United States v. Mejia*, 600 F.3d 12, 19-20 (1st Cir. 2010) (finding that questions related to the accuracy of a translation are "more properly directed to the weight of the evidence, not its admissibility"); *see also United States v. Fujii,* 301 F.3d 535, 540-41 (7th Cir. 2002) (stating it is the "function of the finder-of-fact to weigh the evidence presented by the parties as to the accuracy of the proffered translation and to determine the reliability of the translation on the basis of that evidence"); *Vega-Arizmendi*, 2017 U.S. Dist. LEXIS at *8 (observing that the "[d]efendant will have the opportunity to challenge [the detective's] translation abilities and the accuracy of his interpretation . . . through cross-examination at trial").

        coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

475 U.S. at 421.

    Significantly, Vega does not allege that the law enforcement officers were coercive, and the Court notes that Vega's and the officers' demeanors show no evidence of coercion. Vega was not handcuffed during the preceding inspection with CBP, and he was sitting on a chair in hard secondary, without handcuffs or other restraints, when Agent Blyden and Officer Vazquez arrived to read him his *Miranda* warnings and conduct the interrogation. While there were a few uniformed officers milling about when Agent Blyden arrived, their body language was relaxed, and Agent Blyden arrived dressed in street clothes. Moreover, Vega showed no negative body language or other signs of stress or discomfort while in hard secondary, either before the *Miranda* warnings or while signing the waiver. As such, the Court finds that Vega was not intimidated, coerced, or deceived into waiving his rights, satisfying the first prong of the *Moran* test.

    The Court now turns to the second prong—whether Vega waived his rights knowingly and intelligently. Vega argues that because Officer Vazquez did not translate the interrogation accurately, the Government cannot prove that Vega's signature on the waiver indicated the requisite understanding of the rights he waived. Vega contends that the "Court has to credit Officer Vazquez in order to find that Mr. Vega made a knowing and intelligent waiver." (ECF No. 57 at 64:8-10.)

    The Third Circuit has found that interviews, answers, and actions of suspects can provide evidence that the suspect understood his rights. *United States v. Chang Ping Lin*, 131 F. App'x 884, 886 (3d Cir. 2005) (listing a suspect's responses which are appropriate to the questions asked of him, interactions that demonstrate a suspect is not having difficulty understanding, or a suspect invoking his right to silence or the right to an attorney after previously waiving such right, as examples of behaviors that indicate understanding on the part of the suspect).

    Here, Vega's interaction with the officers during the interrogation that followed Vega's signing of the waiver provides evidence of his understanding of his rights which he

waived. The audio recording of Agent Blyden's interrogation of Vega began with the agent stating that the officers read Vega his rights, and that Vega waived them and wanted to speak with the officers. Vega did not contradict her recorded statement or ask what she meant. Vega answered questions freely until the interrogation turned to the topic of what the officers found in his luggage and questions about his stay on St. Thomas.[6] Thereafter, Vega said he did not want to talk any more, demonstrating that he knew he had the right to be silent and could retract his previous waiver to speak with the officers. *See* ECF Nos. 56 at 55:12-14; 57 at 61:1-12. *See also Chang Ping Lin*, 131 F. App'x at 886 ("'All indications to any objective observer were that the defendant understood what [the detective] indicated to him, including specifically his *Miranda* warnings.'... That conclusion is reinforced by the fact that [the defendant] did terminate the questioning shortly after [the detective] began."). Further, the testimony of two veteran law enforcement officers, Agent Blyden and Officer Vazquez, provides evidence that Vega understood his rights and initially chose to waive them to speak with the officers.

The Court has already found that Officer Vazquez was sufficiently familiar with the *Miranda* warnings in both Spanish and English to appropriately represent them to Vega in Spanish. The Court has also found credible Officer Vazquez' testimony regarding the reading of the warnings to Vega. The Court now concludes that Vega's waiver was valid, as "the product of a free and deliberate choice rather than intimidation, coercion, or deception," waived "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," thus satisfying both requisite prongs of the analysis. *Moran*, 475 U.S. at 421.[7]

---

[6] Agent Blyden's questions were interpreted into Spanish by Officer Vazquez, and Vega's questions and answer were translated from Spanish to English by the same officer. Additionally, throughout the roughly half-hour interrogation, Vega had the opportunity to ask questions of Agent Blyden through Officer Vazquez's interpretation.

[7] The Court agrees with Vega that best practices would be for HSI to read the *Miranda* warnings on audio recording, for the record. However, neither the Constitution nor case law so requires. *Carrion v. Butler*, 835 F.3d 764, 776 (7th Cir. 2009) (clarifying that the "best practices" do not define the scope of the analysis of whether statements were voluntary: "the basic question before us is not whether the officers in this case adhered to best practices but whether the circumstances surrounding the defendant's confession would have interfered with his free and deliberate choice of whether to confess") (citing *Johnson v. Pollard*, 559 F.3d 746, 753 (7th Cir. 2009) (omitting internal quotation marks)).

### 3. Whether the Statements Vega made to Agent Blyden were Voluntary

Under the Fifth Amendment, even if a defendant waived his rights voluntarily, knowingly, and intelligently, his statements must also be voluntary for them to be admissible at trial. Courts look to the totality of the circumstances to determine whether the defendant's will was overborne or his capacity for self-determination was critically impaired, thereby rendering his statements involuntary and inadmissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). Courts should consider traditional indicia of coercion, such as the age, education, and intelligence of the defendant; whether he was advised of his constitutional rights; the length of the detention; prolonged nature of the interrogation; and any use of physical punishment such as deprivation of sleep or food. *Schneckloth*, 412 U.S. at 226. However, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *United States v. Griggie*, 105 F. App'x 431, 435 (3d Cir. 2004) (citing *Connelly*, 479 U.S. at 167).

In his motion, Vega contends that "any statements, admissions, or confessions were involuntary and made in violation of the Due Process Clause of the Fifth Amendment." (ECF No. 24 ¶ 10.) However, Vega provides neither factual support nor legal authority for this assertion and never argues this point in the suppression hearing. Consequently, the Court finds that this argument is waived. *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("As a threshold matter, an argument consisting of no more than a conclusory assertion such as the one made here (without even a citation to the record) will be deemed waived."); *United States v. Alexander*, 467 F. App'x 355, 368 (6th Cir. 2012) (concluding that "perfunctory claims" not argued are deemed waived); *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues.").

Nevertheless, the Court will conduct a totality of the circumstances analysis. Defendant Vega is a young adult man with a seventh or eighth grade education, whose first language is Spanish. Notwithstanding his self-reported illiteracy, the audio recording of the

*United States v. Soto Robles et al.*
Case No.: 3:20-cr-0033
Memorandum Opinion
Page **17** of **17**

interrogation demonstrates that Vega conversed easily with Officer Vazquez in Spanish throughout his interrogation. Vega was advised of his rights in his native language. His detention lasted approximately three-and-a-half hours, less than an hour of which related to the reading of his *Miranda* rights and the interrogation itself. Further, there is no allegation or evidence of any physical punishment or deprivation. Indeed, video footage of Vega signing the waiver and going with the officers to the CBP office for the interrogation supports a finding that he was not coerced. As Vega and the officers left hard secondary, Vega willingly followed the officer several paces behind, walking naturally and showing no sign of stress, duress, or coercion. The Court thus finds no coercive police conduct and therefore concludes that Vega's statements were voluntarily given. *Withrow v. Williams*, 507 U.S. 680, 693 (1993) ("'[T]he crucial element' of the inquiry . . . is 'police coercion.'"); *Swint*, 15 F.3d at 289 ("Unless there is 'police conduct causally related to the confession,' a confession is considered voluntary. Thus, a court will not hold that a confession was involuntary unless it finds that it was the product of 'police overreaching.'") (quoting *Connelly*, 479 U.S. at 164).

## IV.  CONCLUSION

For the reasons set forth above, the Court finds that Vega waived his *Miranda* rights voluntarily, knowingly, and intelligently. The Court also finds that his statements were made voluntarily and were not the product of police coercion or otherwise impermissible tactics. Consequently, the Court concludes that the Government did not obtain Vega's statements in violation of *Miranda*, nor did the Government violate Vega's Fifth Amendment right against self-incrimination nor his Due Process Rights. The Court will deny Vega's motion to suppress the statements made to law enforcement on August 20, 2020. An appropriate order follows.

**Dated:** July 13, 2022                                      */s/ Robert A. Molloy*
                                                              **ROBERT A. MOLLOY**
                                                              **Chief Judge**